## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DARRYL JONES, individually, and on
behalf of all others similarly situated,

        Plaintiff,

                                Case No. 2:20-cv-00520-LA

v.

MARINE CREDIT UNION,

        Defendant.

## COMPILATION OF UNPUBLISHED DECISIONS CITED IN DEFENDANT
## MARINE CREDIT UNION'S BRIEF IN SUPPORT OF MOTION TO DISMISS

BECK, CHAET, BAMBERGER & POLSKY, S.C.

Joseph M. Peltz, Esq.
State Bar No. 1061442
jpeltz@bcblaw.net
Matthew S. Vignali, Esq.
State Bar No. 1023288
mvignali@bcblaw.net
Steven W. Jelenchick, Esq.
State Bar No. 1037766
sjelenchick@bcblaw.net
330 East Kilbourn Avenue, Ste. 1085
Milwaukee, WI 53202
Telephone: 414-273-4200
Fax: 414-273-7786

*Attorneys for Defendant, Marine Credit Union*

## UNPUBLISHED DECISIONS

1.  *Dilday v. Directv, LLC*, 2017 WL 1190916 (E.D. Va. Mar. 29, 2017).

2.  *Jaras v. Equifax Inc.*, 766 Fed. Appx. 492 (9th Cir. 2019).

3.  *Kowalkowski v. Francois Sales and Services, Inc.*, 2019 WL 2189484 (W.D. Wis. May 21, 2019).

4.  *Newlin v. Comcast Cable of Indiana, Inc.*, 2015 WL 363426 (N.D. Ind. January 27, 2015).

5.  *Perez v. Portfolio Recovery Associates, LLC*, 2012 WL 5373448 (D. Puerto Rico October 30, 2012).

KeyCite Yellow Flag - Negative Treatment
Distinguished by Deutsche Bank National Trust Company as Trustee for
Home Equity Mortgage Loan Asset-Backed Trust Series Inabs 2006-A
v. Buck, E.D.Va., March 29, 2019

2017 WL 1190916
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Richmond Division.

Michael DILDAY, Plaintiff,
v.
DIRECTV, LLC. et al., Defendants.

Civil Action No. 3:16CV996-HEH
|
Signed 03/29/2017

Attorneys and Law Firms

Craig Carley Marchiando, Elizabeth W. Hanes, Leonard
Anthony Bennett, Consumer Litigation Associates,
Newport News, VA, for Plaintiff.

John Willard Montgomery, Jr., John W. Montgomery Jr.
Attorney PLC, Richmond, VA, for Defendants.

**MEMORANDUM OPINION**

**(Dismissing Case for Lack of Subject-Matter
Jurisdiction)**

Henry E. Hudson, United States District Judge

*1 THIS MATTER is before the Court on its own
initiative. Plaintiff Michael Dilday ("Plaintiff") brings this
action against DIRECTV, LLC ("DIRECTV") and
Equifax Information Services, LLC ("Equifax") alleging
violations of the Fair Credit Reporting Act, 15 U.S.C. §
1681 et seq.¹ (See generally Compl., ECF No. 1.)

As an affirmative defense, DIRECTV asserted that

Plaintiff lacks standing to bring this action because he has
not suffered a concrete and particularized injury.
(DIRECTV's Answer ¶ 36, ECF No. 10.) Because this
calls into question subject-matter jurisdiction, the Court
ordered the parties to submit memoranda addressing
Plaintiff's standing. (ECF No. 13.)

Pursuant to the Court's Order, Defendants filed a joint
opening brief on February 13, 2017, arguing that this
Court lacks subject-matter jurisdiction because Plaintiff
has suffered no injury and thus has no standing. (ECF No.
14.) At Plaintiff's request, the Court granted him a
two-week extension to file his response brief, yet he has
failed to do so. (See ECF No. 18.) Despite Plaintiff's lack
of response, the Court finds that the facts and legal
contentions are adequately presented in the materials
before the Court. The Court will also dispense with oral
argument, which would not aid in the decisional process.
E.D. Va. Loc. Civ. R. 7(J).

For the reasons that follow, the Court finds that it lacks
subject-matter jurisdiction and therefore must dismiss this
action.

**I. BACKGROUND**
In his three-count Complaint filed on December 21, 2016,
Plaintiff avers that DIRECTV obtained his consumer
report from Equifax, despite the fact that he never had an
account with DIRECTV. (Compl. ¶¶ 9, 10.) The
Complaint, however, conspicuously omits any factual
allegation regarding why DIRECTV obtained his credit
report or how DIRECTV allegedly used it.

Plaintiff contends that Equifax "did not have a lawful or
reasonable basis to believe, let alone know, that
DIRECTV had a permissible purpose to obtain and use
[his] consumer report" and that it lacked reasonable
procedures to "assume the proper use of and lawful
purpose for such reports." (Id. ¶¶ 12, 19.) Therefore,
Plaintiff asserts in a conclusory manner that he is "entitled
to recover actual damages" because Equifax "provided
and published" his consumer report to DIRECTV. (Id. ¶¶
13, 17, 21.)

However, Plaintiff has failed to plead what those "actual
damages" are. And, when presented with the Court's
concern over whether it has subject-matter jurisdiction
in this case (see ECF No. 13), Plaintiff neither took steps to
defend the sufficiency of his factual allegations nor
attempted to file an amended complaint bolstering his

position.

## II. LEGAL FRAMEWORK

A bedrock constitutional principle of our Federal Government is the division of powers between its branches. As such, it is well settled that judicial power is limited to the extent that federal courts may exercise jurisdiction only over "cases" and "controversies." U.S. Const. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). Thus, subject-matter jurisdiction requires a justiciable case or controversy within the meaning of Article III of the United States Constitution. *See Allen v. Wright*, 468 U.S. 737, 750–51 (1984) abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). Standing constitutes one component of justiciability. *Lujan*, 504 U.S. at 560. Whether a plaintiff has standing presents a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "The objection that a federal court lacks subject-matter jurisdiction ... may be raised by a party, or by a court on its own initiative, at any stage in the litigation...." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

**\*2** The Supreme Court has established that the "irreducible constitutional minimum" of standing includes three elements: (1) an injury-in-fact; (2) a causal connection between the injury and the alleged misconduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S at 560–61 (citations omitted). Because Plaintiff seeks to invoke this Court's jurisdiction, he bears the burden of establishing all three elements. *Id.* At 561. "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

In *Spokeo*, the Supreme Court reiterated the basic tenants of the standing doctrine. 136 S. Ct. 1540, 1547 (2016). It noted that to satisfy the injury-in-fact requirement, a plaintiff must show " 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual and imminent, not conjectural or hypothetical.' " *Id.* at 1548 (citing *Lujan*, 504 U.S. at 560).

To satisfy the particularization requirement, the plaintiff "must allege a distinct and palpable injury to himself." *Warth*, 422 U.S. at 501 (citations omitted). The injury

must "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Claims asserting " 'generalized grievance[s]' shared in substantially equal measure by all or a large class of citizens ... normally do[ ] not warrant exercise of jurisdiction." *Warth*, 422 U.S. at 499 (citations omitted).

Standing's concreteness requirement means that an injury must be real, not abstract. *Id.* However, it is possible for an intangible harm to be concrete.[2] *Spokeo*, 136 S. Ct. at 1549. In determining whether such intangible harms are sufficiently concrete to satisfy Article III's requirements, Congress' "judgment is ... instructive and important." *Id.*

In creating statutory rights of action Congress has identified "injuries that were previously inadequate in law." *Id.* (quoting *Lujan*, 504 U.S at 578). However, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* The Supreme Court has made clear that "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.*

When a plaintiff alleges a statutory violation, he usually must plead an additional injury in order to satisfy the concreteness requirement. Concreteness can certainly be satisfied by alleging a harm—either tangible or intangible—which has already occurred or is continuing to occur. But concreteness can also be satisfied where the plaintiff faces a "risk of real harm" likely to occur in the future. *Id.*

In some circumstances, however, merely pleading "the violation of a procedural right granted by statute" is sufficient to satisfy concreteness. *Id.* This occurs in situations where the legislature has codified causes of action with intangible harms where recovery was long permitted at common law. *Id.* (citing Restatement (First) of Torts §§ 569 (libel), 570 (slander *per se*) (1938); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20-25 (1998) (access to public information); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (access to public information). "[A] plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id.* (emphasis in original).

**\*3** However, absent this narrow exception where Congress has codified a common law intangible injury, standing only exists for a statutory violation where the plaintiff has also alleged an additional concrete harm. In *Spokeo*, the Supreme Court highlighted this requirement

in the FCRA context. For example, the Court noted that a consumer reporting agency may fail to provide the statutorily required notice to the user of consumer information, even if that information is entirely accurate. *Id.* at 1550. Or, the agency might provide some wholly inaccurate, yet benign, information, such as an incorrect zip code. *Id.* While both of these situations constitute statutory violations, the "victim" has no standing because the conduct does not "cause harm or present any material risk of harm." *Id.*

It is with these principles in mind that the Court conducts its analysis.

### III. DISCUSSION

Plaintiff alleges that Equifax violated 15 U.S.C. § 1681b(a) by providing Plaintiff's consumer report to DIRECTV without a permissible purpose. Plaintiff further alleges that Equifax violated 15 U.S.C. § 1681e(a) by failing to maintain reasonable procedures to prevent unlawful consumer report disclosures. However, the Complaint is devoid of any reference to Plaintiff suffering any harm as a result of these violations or his susceptibility to the risk of real harm in the future. Therefore, as discussed above, Plaintiff can only proceed if the statutory violations he pleaded are sufficient to constitute a concrete injury.

The Court finds that the FCRA violations which Plaintiff alleges do not, by themselves, constitute an injury in fact. Those statutory rights are not the type for which "the law has long permitted recovery." *Spokeo*, 136 S. Ct. at 1549.

Because Plaintiff has failed to comply with the Court's order to brief the issue of standing, the Court must speculate as to how Plaintiff would classify his injury. His strongest argument would likely be that the FCRA has codified a long-standing privacy right. A court in this district has recently found the mere pleading of a FCRA violation sufficient to confer standing for that exact reason. *See Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623 (E.D. Va. 2016).[3]

In *Thomas*, a class of plaintiffs sued their prospective employers for violating the FCRA by failing to provide required disclosures and to obtain the applicants' consent prior to accessing their consumer reports. 193 F. Supp. 3d at 625 (citing 15 U.S.C. § 1681b(b)). The court found that this provision of the FCRA created two statutory rights. *Id.* at 634. First, the court concluded that the statute provides the right to receive required disclosures. *Id.*

Second—and pertinent to this discussion—the *Thomas* court found that the FCRA provides "a right to the privacy of one's personal information." *Id.*

The court concluded that the mere violation of each of these statutory rights constitutes a concrete injury. *Id.* at 637. When analyzing the privacy right, the court found that "the common law has long recognized a right to personal privacy, and 'both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.' " *Id.* at 635 (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989)).

However, the Fourth Circuit's subsequent decision in *Beck v. McDonald*, 848 F.3d 262, 266 (4th Cir. 2017), adds instructive clarity to the concrete injury analysis. The teachings of *Beck* are subtle but substantive in assessing the harm necessary to support subject-matter jurisdiction.

*4 Evolution of the common law to include a cause of action for invasion of privacy began in the early Twentieth Century. *See* Restatement (Second) of Torts § 652A (1977). The term "invasion of privacy" typically encompasses four distinct wrongs. *Id.* These include intrusion upon seclusion, appropriation of name or likeness, publicity given to private life, and publicity placing a person into false light. *See id.* §§ 652B–652E. Publicity given to private life is the wrong that would most closely associate with the FCRA's prohibition on the unauthorized publication of a consumer report.

The FCRA, however, cannot be considered a codification of the tort of publicity given to private life because the FCRA does not require publicity. A consumer reporting agency violates the FCRA for simply publishing one copy of a consumer report to a single user without a permissible purpose. *See generally* 15 U.S.C. § 1681b. However, the Restatement of Torts is clear that publicity differs from publication. Restatement (Second) of Torts § 652D cmt. a (1977). While publication is achieved merely by communicating information to a single person, publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* Thus, the cause of action created by the FCRA for a violation of § 1681b is much broader than the traditional common law invasion of privacy.

Moreover, at common law, the tort of publicity given to private life only applies to highly offensive publicity. *Id.*

cmt. c. But the FCRA's restrictions on the publication of consumer reports is much broader. Any publication of a consumer report for a reason other than those stated in 15 U.S.C. § 1681b(a)—regardless of whether that publication would be highly offensive—constitutes a statutory violation.[4]

Because the common law does not permit suit for merely sharing private information with a single third party, a violation of the FCRA's prohibition on furnishing a consumer report absent a permissible purpose cannot, standing alone, be understood to constitute a concrete injury. *See Spokeo*, 136 S. Ct. at 1549. Instead, it is the type of statutory violation that requires an additional concrete harm—either past or present harm or the risk of real harm in the future—to satisfy the injury-in-fact requirement of Article III. *Id.*

The Fourth Circuit's recent decision in *Beck* supports this conclusion. 848 F.3d 262. In *Beck* the court consolidated two cases that both involved data breaches at the Dorn Veterans Affairs Medical Center in Columbia, South Carolina. *Id.* at 267–68. The plaintiffs alleged that both data breaches constituted violations of the Privacy Act. *Id.* at 266–68. However, they did not "allege that Dorn VAMC's violations of the Privacy Act alone constitute an Article III injury-in-fact." *Id.* at 271 n.4. Rather, the plaintiffs also asserted that they suffered concrete injury from the future risk of harm of identity theft. *Id.* at 266–267.

The Fourth Circuit found that the plaintiffs' speculative allegations were "insufficient to establish a 'substantial risk' of harm" necessary to show a concrete injury. *Id.* at 275. Consequently, the court held that plaintiffs' abstract

claim of harm was insufficient to demonstrate standing. *Id.* at 277. Importantly, the Fourth Circuit recognized *Spokeo's* holding that "some violations of the [FCRA], though 'intangible' harms, may still be sufficiently 'concrete' to establish an Article III injury-in-fact." *Id.* at 271 n.4 (citing *Spokeo*, 136 S. Ct. at 1549-50.). Yet the *Beck* court did not even suggest that the theft of the plaintiffs' personal information resembled a common law invasion of privacy sufficient to create a concrete injury merely by alleging a statutory violation. *See generally id.*

*5 Therefore, under the law of this circuit, Plaintiff's mere allegation of a bare statutory violation in this case is insufficient to confer standing. This does not mean that Plaintiff could never have standing to bring an action to recover for the FCRA violations which he alleges. But he must plead a concrete harm in order to satisfy the injury-in-fact requirement of Article III.

## IV. CONCLUSION
Based on the foregoing, this case will be dismissed without prejudice.

An appropriate Order will accompany this Memorandum Opinion.

All Citations

Not Reported in Fed. Supp., 2017 WL 1190916

Footnotes

1    Plaintiff and DIRECTV have since stipulated to the dismissal of all claims against DIRECTV, leaving Equifax as the only remaining defendant. (*See* ECF No. 24.)

2    Examples of these intangible injuries include libel, slander, and violations of the constitutional rights to free speech and free exercise. *See Spokeo*, 136 S.Ct. at 1549 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); Restatement (First) of Torts §§ 569, 570).

3    *See also Burke v. Fed. Nat'l Mortg. Ass'n*, No. 3:16CV153-HEH, 2016 WL 4249496 (E.D. Va. Aug. 9, 2016) (adopting *Thomas*'s reasoning), *vacated*, No. 3:16CV153-HEH, 2016 WL 7451624 (E.D. Va. Dec. 6, 2016) (dismissing case after parties stipulated to lack of subject-matter jurisdiction).

4    Similarly, the FCRA could not be considered a codification of the common law prohibition on intrusion upon seclusion. That tort requires an intentional interference in an individual's interest in seclusion "that would be highly offensive to a reasonable man." Restatement (Second) of Torts § 652B cmt. a (1977).

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Calvillo v. Experian Information Solutions, Inc.,
D.Nev., April 1, 2020

766 Fed.Appx. 492
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 9th Cir.
Rule 36-3.
United States Court of Appeals, Ninth Circuit.

Jesus JARAS, Plaintiff-Appellant,
v.
EQUIFAX INC., Defendant-Appellee.
Wilbur Green, Plaintiff-Appellant,
v.
Experian Information Solutions, Inc.; et al.,
Defendants-Appellees.
Howard Rydolph, Plaintiff-Appellant,
v.
Experian Information Solutions, Inc.; et al.,
Defendants-Appellees.
Kimberly Contreras, Plaintiff-Appellant,
v.
Experian Information Solutions, Inc.; et al.,
Defendants-Appellees.
Scott Hunter, Plaintiff-Appellant,
v.
Experian Information Solutions, Inc.; et al.,
Defendants-Appellees.

No. 17-15201, No. 17-15987, No. 17-15990, No.
17-15991, No. 17-15992
|
Argued and Submitted September 5, 2018 San
Francisco, California
|
Filed March 25, 2019

## Synopsis
**Background:** Debtors brought separate actions against
credit reporting agencies, alleging that account
information in their credit reports was inconsistent with
their confirmed Chapter 13 bankruptcy plans. The United
States District Court for the Northern District of
California, No. 5:16-CV-03336, Lucy H. Koh, J., and
Nos. 3:16-CV-05679, 3:16-CV-05694, 3:16-CV-06315,
and 3:16-CV-06335, William Alsup, J., granted agencies'
motions to dismiss. Debtors appealed.

**[Holding:]** The Court of Appeals held that debtors'
allegations were insufficient to support standing.

Affirmed in part, vacated in part, and remanded with
instructions.

Berzon, Circuit Judge, filed opinion dissenting in part.

West Headnotes (1)

**[1]** **Finance, Banking, and Credit**⟜Parties;
standing
**Finance, Banking, and Credit**⟜Credit
reporting

Bankruptcy debtors' allegations that account
information in their credit reports was
inconsistent with their confirmed Chapter 13
bankruptcy plans and that inaccuracies remained
after allowing adequate time for credit reporting
agencies to investigate and update the
information were insufficient to support
standing to bring claims against the agencies and
creditors under the federal Fair Credit Reporting
Act (FCRA) and California's Consumer Credit
Report Agencies Act (CCRAA); debtors made
no allegations about how the inaccuracies would
affect any transaction they tried to enter, and
debtors alleged no transactions for which their
credit reports or scores would be reviewed at all,
but instead debtors made only broad
generalizations about how lower FICO scores
affected lending decisions. 15 U.S.C.A. §
1681s-2(b); Cal. Civ. Code § 1785.25(a).

8 Cases that cite this headnote

Attorneys and Law Firms

***493** Elliot Gale, Gale, Angelo, Johnson, & Pruett, P.C.,
Roseville, CA, for Plaintiff-Appellant

Thomas P. Quinn, Jr., Nokes & Quinn APC, Laguna

Beach, CA, Anne M. Voigts, King & Spalding LLP, Palo Alto, CA, for Defendant-Appellee

Appeal from the United States District Court for the Northern District of California, Lucy H. Koh, District Judge, Presiding, D.C. No. 5:16-cv-03336-LHK; William Alsup, District Judge, Presiding, D.C. No. 3:16-cv-05679-WHA, D.C. No. 3:16-cv-05694-WHA, D.C. No. 3:16-cv-06315-WHA, D.C. No. 3:16-cv-06335-WHA

Before: BERZON and FRIEDLAND, Circuit Judges, and DOMINGUEZ,* District Judge.

MEMORANDUM**

The Plaintiffs in these related cases—Wilbur Green, Howard Rydolph, Kimberly Contreras, Scott Hunt, and Jesus Jaras (collectively, "Plaintiffs")—filed for bankruptcy between 2011 and 2014 under Chapter 13 of the Bankruptcy Code. After the bankruptcy court confirmed their Chapter 13 plans, Plaintiffs requested their credit reports and noticed that some account information was being reported in a manner that they allege is inconsistent with the treatment of those claims in their confirmed bankruptcy plans. Plaintiffs asked the three largest credit reporting agencies—Experian Information Solutions, Inc., Equifax, Inc., and Transunion, LLC—to update the information to match their confirmed bankruptcy plans. But when Plaintiffs requested their credit reports again after allowing the credit reporting agencies adequate time to reinvestigate and update the information, they allege that several inaccuracies remained.

Plaintiffs subsequently sued credit reporting agencies and creditors providing the allegedly inaccurate information under **494 the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b), and its California law counterpart, the California Consumer Credit Report Agencies Act ("CCRAA"), Cal. Civ. Code § 1785.25(a), alleging that a confirmed Chapter 13 bankruptcy plan changes the legal status of prior debts, and that such changes must be reflected in the credit report in order for the report to be accurate and not misleading. The district courts granted Defendants' motions to dismiss or for judgment on the pleadings, holding that the challenged statements were not inaccurate so FCRA did not require changing them. On review, we affirm the dismissal of these complaints, but on the grounds that Plaintiffs—a

group of individuals in bankruptcy who gave no indication that they had tried to engage in or were imminently planning to engage in any transactions for which the alleged misstatements in their credit reports made or would make any material difference—lack standing to pursue their claims.

In *Spokeo, Inc. v. Robins*, the Supreme Court held that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." — U.S. —, 136 S.Ct. 1540, 1549, 194 L.Ed.2d 635 (2016). Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* The Supreme Court offered a specific example to show that "not all inaccuracies cause harm or present any material risk of harm"—stating that "[i]t is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Id.* at 1550. The Court then remanded to our court to determine whether the alleged FCRA violations "entail[ed] a degree of risk sufficient to meet the concreteness requirement." *Id.*

On remand, we accordingly considered whether the alleged FCRA violations—Spokeo's publication on the internet of a credit report that falsely stated the plaintiff's age, marital status, wealth, education level, and profession, in violation of 15 U.S.C. § 1681e(b)—were more material than a zip code error and thus amounted to a sufficiently concrete injury to support Article III standing. *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1111 (9th Cir. 2017). The plaintiff alleged that the inaccuracies harmed his chances of making a favorable impression on prospective employers and that he was actively looking for a job. *Id.* at 1117. In holding that the plaintiff did have standing, we emphasized that the inaccuracies in the credit report at issue had already been requested and obtained by at least one third party, and that they were of a type likely enough to cause harm to his employment prospects at a time when he was unemployed and actively looking for work. *Id.* at 1116-17.

By contrast, Plaintiffs here do not make any allegations about how the alleged misstatements in their credit reports would affect any transaction they tried to enter or plan to try to enter—and it is not obvious that they would, given that Plaintiffs' bankruptcies themselves cause them to have lower credit scores with or without the alleged misstatements. They have therefore said nothing that would distinguish the alleged misstatements here from the inaccurate zip code example discussed by the Supreme Court in *Spokeo*. Indeed, Plaintiffs have not alleged that they tried to enter any financial transaction for which their

credit reports or scores were viewed at all, or that they plan to imminently do so, let alone that the alleged inaccuracies in their credit reports would make a difference to such a transaction. Unlike the plaintiff in *Spokeo*, Plaintiffs did not say anything about what kind of harm they **\*495** were concerned about, other than making broad generalizations about how lower FICO scores can impact lending decisions generally—without any specific allegation that lower FICO scores impact lending decisions regarding individuals who are already in Chapter 13 bankruptcy. Without any allegation of the credit report harming Plaintiffs' ability to enter a transaction with a third party in the past or imminent future, Plaintiffs have failed to allege a concrete injury for standing.[1]

The absence of allegations that Plaintiffs have suffered or imminently will suffer a concrete injury compels dismissal of the Complaints in this case for lack of standing. *Spokeo*, 136 S.Ct. at 1547-48. But such dismissals should be without prejudice. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) ("Plaintiffs have not satisfied the requirements [for] ... standing. In theory, Plaintiffs could allege ... facts that might support standing. As a result, the complaint should have been dismissed *without* prejudice."); *Hampton v. Pac. Inv. Mgmt. Co. LLC*, 869 F.3d 844, 846 (9th Cir. 2017) ("Dismissals for lack of ... jurisdiction ... must be without prejudice.").

AFFIRMED in part and VACATED in part. REMANDED with instructions to enter dismissals without prejudice.

BERZON, Circuit Judge, partially dissenting:

I respectfully dissent from the majority's holding that Plaintiffs have not alleged a concrete injury sufficient to establish standing. The majority requires Plaintiffs to allege that the inaccuracies in their credit reports affected a specific previous or imminent transaction. No such requirement exists in our case law, nor should it.

To plead a concrete injury in a FCRA action for correction of an inaccurate credit report, individuals must allege that a violation of FCRA "actually harm[s], or present[s] a material risk of harm" to their concrete interests. *Robins v. Spokeo, Inc.*, 867 F.3d 1108 (9th Cir. 2017). Nearly all Plaintiffs state that inaccuracies in the reporting of their confirmed bankruptcy lowered their credit score.[1] Those allegations satisfy the concrete harm

requirement.

Unlike an erroneous zip code, *see Spokeo, Inc. v. Robins*, ––– U.S. –––, 136 S.Ct. 1540, 1550, 194 L.Ed.2d 635 (2016), the alleged inaccuracies in Plaintiffs' credit reports harm or present a material risk of harm to their concrete interests. Credit reports exist to convey information to third parties and are used in a wide variety of transactions, from applying for a home loan to purchasing a cell phone.[2] In most instances, third parties need not give **\*496** notice before accessing an individual's credit report, 15 U.S.C. § 1681b(2)(A) (requiring notice only when requesting credit reports for employment purposes); and in some instances, third parties can access credit reports without the consumer taking any action to instigate a transaction—pre-screening individuals for offers of credit or insurance, for example. *See* 15 U.S.C. § 1681b(c)(1)(B). It is thus often difficult to predict when a credit report may be accessed or to know when it has been accessed, and inaccuracies that are discovered may take up to 30 days to investigate and correct. *See* 15 U.S.C. § 1681i(a)(1)(A).

Given their "ubiquity and importance ... in modern life—in employment decisions, in loan applications, in home purchases, and much more—the real–world implications of material inaccuracies in [credit] reports seem patent on their face." *Robins*, 867 F.3d at 1114. That is because "[t]he threat to a consumer's livelihood is caused by the very existence of inaccurate information in his credit report and the likelihood that such information will be important to one of the many entities who make use of such reports." *Id.*

As a result, adverse information on a credit report, often resulting in a lower credit rating, constitutes a reputational injury creating a material risk of harm, whether or not an individual contemplates a specific, imminent transaction. Our decision on remand from the Supreme Court in *Robins v. Spokeo, Inc.* so recognizes, and does *not* demand an allegation of known access by a third party or of a past, or imminent, specific transaction. The plaintiff in *Robins* alleged only that a website's posting of inaccurate information about his personal life "caused actual harm to [his] employment prospects" because he was "actively seeking employment." First Amended Complaint at ¶¶ 34-35, *Robins*, 867 F.3d 1108. He did not state what specific transactions he was undertaking to look for employment, or whether any prospective employer had looked at the allegedly inaccurate reports.

Nonetheless, we held that he had alleged a sufficiently concrete injury to establish standing. *Id.* at 1118. We did not require the plaintiff to be more specific because we

recognized that "determining whether any given inaccuracy in a credit report would help or harm an individual (or perhaps both) is not always easily done." *Id* at 1117. Moreover, we rejected the argument that Robins lacked standing because he had only "asserted that such inaccuracies *might* hurt his employment prospects, but not that they present a material or impending risk of doing so." *Id.* at 1118. We held that making available "a materially inaccurate consumer report" was injury enough. *Id.*

Plaintiffs' allegations in this case are just as specific and just as concrete as the ones we accepted in *Robins*. For that reason, I would hold that Plaintiffs have standing.

I note that establishing constitutional standing is separate from answering the substantive question, as required by FCRA, of whether Plaintiffs' credit reports are "patently incorrect, or ... misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009). The original dispute in this case—before the panel asked for supplemental briefing on the standing issue—was whether any error in those credit reports meets this standard, given that the Plaintiffs' pre-petition bankruptcy debts were not yet discharged and the Chapter 13 plans, even if accurately reported, might have the same consequences for future transactions as the current reporting method. In my view, that bankruptcy-focused issue is the *497 one we should be addressing, as the plaintiffs do have standing. But as the majority does not address this substantive question, I do not either.

I respectfully dissent.

All Citations

766 Fed.Appx. 492

Footnotes

*   The Honorable Daniel R. Dominguez, United States District Judge for the District of Puerto Rico, sitting by designation.

**  This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

1   The absence of allegations of an actual or imminent concrete harm also causes Plaintiffs' claims to be too amorphous to litigate. As the Supreme Court has explained:
      The gist of the question of standing is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends ... [Standing] is demanded so that federal courts will not be asked to decide illdefined controversies over ... issues ... or a case which is of a hypothetical or abstract character.
      *Flast v. Cohen*, 392 U.S. 83, 99-100, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (citations and internal quotation marks omitted).

1   Because Plaintiff Jaras did not sufficiently allege that inaccuracies in his credit report adversely affected his creditworthiness, I concur with the majority that his complaint should be dismissed.

2   *See* Beth Braverman, *Getting a new cellphone? Expect a credit check*, Creditcards.com (Feb. 2, 2016), https://www.creditcards.com/credit-card-news/cellphone-credit-check-1270.php.

WESTLAW

2019 WL 2189484
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.

Conner KOWALKOWSKI, Plaintiff,
v.
FRANCOIS SALES AND SERVICES, INC.,
Landmark Credit Union and Ally Financial Inc.,
Defendants.

18-cv-721-slc
|
Signed 05/20/2019
|
Filed 05/21/2019

Attorneys and Law Firms

Heidi N. Miller, HNM Law, LLC, Wauwatosa, WI, for Plaintiff.

Kevin David Trost, Axley Brynelson, Madison, WI, for Defendant Francois Sales and Services, Inc.

Michael Sosnay, Darnieder & Sosnay, Milwaukee, WI, for Defendant Landmark Credit Union.

Ethan Geoffrey Ostroff, Troutman Sanders LLP, Virginia Beach, VA, for Defendant Ally Financial, Inc.

OPINION AND ORDER

STEPHEN L. CROCKER, Magistrate Judge

*1 In this civil suit brought under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (FCRA), and Wis. Stat. 995.50 (invasion of privacy), plaintiff Conner Kowalkowski alleges that defendants Francois Sales and Services, Inc., Landmark Credit Union, and Ally Financial Inc. obtained a copy of his credit report without his permission or a permissible purpose, causing him to have a lower credit score. Before the court is Ally's motion for judgment on the pleadings under Fed. R. Civ. P. 12[c], in which it argues that Kowalkowski's allegations show that Ally had a permissible purpose for

obtaining the credit report and that the FCRA preempts the state law invasion of privacy claim. Dkt. 29. For the reasons stated below, I am granting the motion and dismissing all of Kowalkowski's claims against Ally.

Solely for the purposes of deciding the motion for judgment on the pleadings, I find that Kowalkowski has fairly alleged the following facts in his second amended complaint:

FACTUAL ALLEGATIONS

After purchasing two vehicles from Francois Sales, a car dealership, in May 2018, Kowalkowski gave the dealer permission to pull his credit report on August 14, 2018. (Although it is not clear from the allegations in the second amended complaint, Kowalkowski explains in his response brief that an additional transaction occurred in August 2018, during which he allegedly traded in one of the vehicles he had purchased in May for a third vehicle.) When giving Francois permission to obtain his credit report to secure financing, Kowalkowski specifically asked the dealer (apparently in a text message) to "start by only sending my credit application to people you think may approve me" because "[l]ast time we applied it hit our credit at 18 different banks and hurt my credit a lot." Dkt. 14 at 3. Francois allegedly submitted Kowalkowski's credit application to five lenders, including Ally and Landmark, but submitted the application to Ally and Landmark on two consecutive days. According to Kowalkowski, "[d]efendants should have known that if these companies did not approve Conner for credit on one day, they would also not approve him the very next day." *Id.* ¶ 18.

OPINION

I. Legal Standard

The parties agree that motion for judgment on the pleadings under Fed. R. Civ. P. 12[c] is subject to the same standard as a motion to dismiss under Rule 12(b)(6), which "challenges the viability of a complaint by arguing

that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). In deciding such a motion, the court views the complaint in the light most favorable to the non-movant, accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the non-movant's favor. *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014). A claim should survive a motion to dismiss "if the complaint contains well-pled facts—that is, not just legal conclusions—that permit the court to infer more than the mere possibility of misconduct." *Olson v. Champaign Cty.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

**II. FCRA Claim**

*2 Kowalkowski has brought a claim under the FCRA, 15 U.S.C. § 1681b, alleging that Ally (and the other defendants) obtained his consumer credit report without a permissible statutory purpose. *See§ 1681b(f)* ("A person shall not use or obtain a consumer report for any purpose unless– (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section ..."). Section 1681b(a) provides:

Any consumer reporting agency may furnish a consumer report under the following circumstances and no other:"

\* \* \*

(3) To a person which it has reason to believe –

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to ... the consumer; or

\* \* \*

(F) otherwise has a legitimate business need for the information –

(i) in connection with a business transaction that is initiated by the consumer; or

(ii) to review an account to determine whether the consumer continues to meet the terms of the account.

If an entity requests a report for a purpose not listed in the act, an injured consumer can recover the "actual damages" caused by negligent noncompliance, *see*15 U.S.C. § 1681*o*(a)(1), or both actual and punitive damages caused by willful noncompliance, *see*15 U.S.C. § 1681n. *Stergiopoulos v. First Midwest Bancorp*, 427 F.3d 1043, 1046 (7th Cir. 2005).

Kowalkowski argues that he did not authorize Ally's access of his credit report on two consecutive days because he had limited the release of his credit report by asking Francois to "start by" sending his credit application to lenders that Francois thought might approve him. Ally responds that Kowalkowski's FCRA claim against it fails for two reasons: (1) the alleged statement to Francois did not limit Kowalkowski's consent to pull his credit report because Kowalkowski merely requested that the dealer "start" its search for a lender by contacting only those institutions that were likely to approve financing; and (2) Kowalkowski does not include any allegations in his complaint from which it can be inferred that Ally was aware of his request to Francois. I agree with both points.

As Ally points out, the Court of Appeals for the Seventh Circuit has held that when a consumer initiates a credit transaction at a car dealership by requesting financing, the FCRA "does not require that consumers expressly approve each request for a report," as long as the entity pulling the report is engaged in the credit transaction in which the consumer is participating. *Stergiopoulos*, 427 F.3d at 1046-47. "If the connection between a consumer's search and a bank's request is clear, it is unlikely that the request will infringe the consumer's privacy interests, for it will 'involve' the plaintiff directly." *Id.* at 1047 (citing *Cole v. U.S. Capital*, 389 F.3d 719, 725 (7th Cir. 2004) ("Many of the enumerated permissible purposes set forth in § 1681b are transactions initiated by the consumer; these purposes therefore do not create significant privacy concerns."). Here, the allegations in Kowalkowski's second amended complaint make clear that Ally pulled Kowalkowski's credit report only because Kowalkowski was seeking financing for a newly-purchased car, so "[t]he line of causation was direct and thus the request fell within the purview" of § 1681b(a)(3)(A). *Id.* at 1047 (finding same).

*3 Although Kowalkowski alleges that he told Francois not to "start" with a broad search for lenders because it could harm his credit, it is impossible to infer from this vague request that he did not want any particular lender, namely Ally, to access his credit report, and more importantly, that Ally had any reason to know about his request to Francois. Kowalkowski argues that Ally is

asking him to go beyond notice pleading and allege specific facts regarding the lender's mental state at the time it accessed his credit report. He suggests that "[m]aybe the issue of [Ally's] good faith could be reached after discovery and after Plaintiff determined what went wrong between his limiting instruction and Ally pulling his report on consecutive days" and that the "relationship between Francois Ford and Ally will need to be examined in discovery to see where the ball was dropped.' " Dkt. 41 at 5. However, even though a complaint does not have to provide the complete story, it must contain sufficient allegations to permit the court to infer more than the mere *possibility* of misconduct. *Olson*, 784 F.3d at 1089. Rather, a claim for relief must be "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, there are no allegations to suggest that Ally acted without a permissible purpose in obtaining Kowalkowski's credit report or that Ally had any reason to know that he was concerned about having too many reports pulled.

Notably, the Eastern District of Wisconsin recently rejected a similar "limited consent" argument in a FCRA case brought under § 1681b. *Long v. Bergstrom Victory Lane, Inc.*, 2018 WL 4829192, at *2 (E.D. Wis. Oct. 4, 2018). In that case, Long's claim rested on the allegation that Victory Lane submitted her credit application to a number of financial institutions, even though she told a Victory Lane employee not to run her credit with any other company than Capital One Auto Finance and the employee agreed not to. Relying on *Stergiopoulous* and a few cases from the Northern District of Illinois, the district court held that "[u]nder the FRCA, a business does not require the consent of the potential customer, so long as it has a statutorily defined 'permissible purpose.' " *Id.* (citing *Stergiopoulous*, 427 F.3d at 1047; *Santangelo v. Comcast Corp.*, 2015 WL 3421156, at *4 (N.D. Ill. May 28, 2015); *Minter v. AAA Cook Cty. Consolidation, Inc.*, 2004 WL 1630781, at *4 (N.D. Ill. July 19, 2004)). The court reasoned that "[d]espite Long's objection, when she sought to buy a vehicle from Victory Lane, and agreed to let them use her consumer report to obtain financing, this qualified as a permissible purpose under the statute." *Id.*

Although his argument is not entirely clear, Kowalkowski tries to distinguish *Long* on the ground that the court improperly "relied" on *Ippolito v. WNS*, 864 F.2d 440, 451 n.11 (7th Cir. 1988), for the proposition that § 1681b should be "broadly construed" in determining whether a consumer report was obtained for a permissible purpose. According to Kowalkowski, *Ippolito* was more limited in scope, "provid[ing] insight into how to synthesize business and consumer transactions and reports into a way that falls within the legislative intent for the FCRA." Dkt.

41 at 6. The argument is not persuasive for a two reasons. First, the court in *Long* only cites *Ippolito* as a secondary source in a parenthetical citation in citing *Minter*, 2004 WL 1630781, and did not—as Kowalkowski suggests—"rely" on *Ippolito* to construe § 1681b broadly. Second, *Ippolito*'s discussion of the "business transaction" language in § 1681b(a)(3) has no bearing on the consent issue raised by Long or Kowalkowski because there was no dispute in either case about whether pulling the credit report for a consumer seeking financing for the purchase of a car qualifies as a legitimate business need or transaction. Therefore, the holding in *Long* is not inapplicable in this case.

Finally, Kowalkowski cites *Young v. Harbor Motor Works, Inc.*, 2009 WL 187793, at *4 (N.D. Ind. Jan. 27, 2009), in which the Northern District of Indiana distinguished *Stergiopoulos* and found that Young had not authorized the pulling of his credit report simply by seeking financing for the purchase of a car because Young had limited specifically who could check his credit. The court noted that like Stergiopoulos, Young had initiated the search for credit with the dealership and the lender's credit search was in connection with that credit transaction, but unlike Stergiopoulos, "Young took the proactive measure of explicitly writing 'NONE' on the line of the credit application following the phrase: 'You are notified that your application may be submitted to (Name and Address required).' " *Id.* "As a result, the credit applications indicate that only Honda Financial [and not the lender, Harris] was authorized to obtain credit information about Young." *Id.* Kowalkowski argues that his situation is similar. However, important to the court's decision in *Long* was the fact that the amended complaint alleged that the dealer had submitted the credit application containing the written limitation to the lender, Harris, putting Harris on notice that it did not have permission to pull Young's credit report. *Id.* Without similar allegations suggesting how Ally would be privy to Kowalkowski's alleged "limitation," Kowalkowski fails to state a FCRA claim against Ally under § 1681b.

## III. State Law Claim

*4 Ally argues that Kowalkowski's state law claim for invasion of privacy fails for the same reasons as his FCRA claim and because it is preempted by the FCRA. Because I agree that Kowalkowski's allegations are insufficient to state a claim for invasion of privacy, it is unnecessary to reach Ally's preemption argument.

Under Wisconsin law, an invasion of privacy includes

"[i]ntrusion upon the privacy of another of a nature highly offensive to a reasonable person, in a place that a reasonable person would consider private or in a manner which is actionable for trespass." Wis. Stat. § 995.50(2)(a). "The test is an objective one: whether a reasonable person would find the intrusion highly offensive." *Gillund v. Meridian Mutual Insurance Co.,* 2010 WI App 4, ¶ 29, 323 Wis.2d 1, 778 N.W.2d 662. Without any allegations suggesting how Ally may have known about Kowalkowski's request to keep his credit checks to a minimum, his allegation that Ally pulled his credit report on two consecutive days after he applied for financing to purchase a car does not permit a plausible inference that Ally committed an intrusion of a highly offensive nature. Accordingly, Ally's motion for judgment on the pleadings with respect to the state law claim will be granted.

End of Document

ORDER

IT IS ORDERED that the motion for judgment on the pleadings filed by defendant Ally Financial Inc. under Fed. R. Civ. P. 12(c), dkt. 29, is GRANTED.

All Citations

Slip Copy, 2019 WL 2189484

2015 WL 363426
Only the Westlaw citation is currently available.
United States District Court,
N.D. Indiana.

John R. NEWLIN, Plaintiff,
v.
COMCAST CABLE OF INDIANA, INC.,
Defendant.

No. 2:12–CV–430–TLS.
|
Signed Jan. 27, 2015.

Attorneys and Law Firms

Robert E. Duff, The Law Office of Robert E. Duff,
Fishers, IN, for Plaintiff.

Hugh C. O'Donnell, Sanchez Daniels & Hoffman LLP,
Chicago, IL, for Defendant.

## OPINION AND ORDER

THERESA L. SPRINGMANN, District Judge.

*1 The Plaintiff, John R. Newlin, sought cable services
from Defendant Comcast Cable of
Illinois/Indiana/Michigan, Inc.. After the Plaintiff
discovered that the Defendant had obtained his credit
report, despite the Plaintiff having invoked the
Defendant's policy to accept a $50.00 deposit and
positive proof of identification in lieu of checking his
credit, he sued the Defendant for statutory damages under
the Fair Credit Reporting Act (FCRA), specifically §
1681n of Title 15 of the United States Code, as he did not
suffer any actual damages. The Defendant does not deny
that it obtained the consumer report, but disagrees that it
violated the FRCA, much less that it committed a willful
violation. The parties proceeded to trial without a jury.
Pursuant to Federal Rule of Civil Procedure 52(a), and
after observation of the witnesses at trial and review of
the trial exhibits, the Court enters the following written
findings of facts and conclusions of law.

## FINDINGS OF FACT

At trial, the Court heard testimony from the Plaintiff and
from Rosario Sanfelice, Comcast's Director of Credit and
Collections. The following facts are based on admitted
exhibits and from testimony elicited at trial, and are
undisputed except where noted.

In August 2012, the Plaintiff sought to buy cable services
for his existing home. The Plaintiff and his wife settled on
receiving services from the Defendant after reviewing the
company's packages, pricing, and billing and credit
policies. Because the Plaintiff and his wife anticipated
looking for a new home and obtaining a mortgage, the
Plaintiff considered it important that the Defendant's
credit policy, which he obtained from its website, would
permit him to avoid having his credit report reviewed.
The policy provided:

> A credit check and/or deposit is
> required for new customers (and
> customers with less than six (6)
> months of payment history) who
> lease more valuable Comcast
> equipment or request Comcast
> Digital Voice services with a new
> phone number. If you select a
> credit check, you may also be
> asked to pay a partial deposit. If
> you do not want a credit check, you
> may choose to pay the full deposit.
> The full amount of any deposit will
> be applied to your account balance
> after twelve (12) months, as long as
> the account has been in good
> standing for the previous six (6)
> months.

(Tr. Ex. 3.) The Plaintiff was being diligent about his
credit rating and believed that a check on his credit would
negatively impact his credit score.

On August 6, 2012, the Plaintiff contacted Comcast using
the online instant messaging services available through
the company's website. After he had selected the cable
television services he wished to purchase, the following

Case 2:20-cv-00520-LA   Filed 06/09/20   Page 16 of 23   Document 18

exchange took place between the Plaintiff and the customer service representative who was helping him:[1]

**Atul kumar**>

You have chosen a great package with excellent features and benefits that I am certain you will enjoy. So let me go ahead and provide you with the best customer service experience as well.

***2 Atul kumar**>

Comcast has recently adopted stricker [sic] Federal guidelines to protect our customers from Identity theft. In order for me to create your Comcast account, I'm required to do a Credit Check. May I have the following information in order to process a credit check. Your complete Social Security Number?

**Guest**_>

on your website it says that I can pay a deposit of $50 and not have a credit check performed. I would like to do this

**Atul kumar**>

Ok

**Atul kumar**>

Please allow me few moment.

**Atul kumar**>

I will process the order but you need to verify the ID at the time of installation by submitting valid ID proof to the Techinicians [sic].

**Guest**_>

yes ok

**Atul kumar**>

Thank you.

**Atul kumar**>

I will send you the secured link for payment.

**Guest**_>

ok

(Trial Ex. 1.) The Plaintiff paid $50 to Comcast by credit card, which Kumar acknowledged had been processed. Kumar stated that the Plaintiff had successfully created an account, and that his "estimated first month's bill will be $32.04 including taxes and fees as you have made the payment of $50.00." (*Id.*)[2]

On this same date, Comcast obtained a copy of the Plaintiff's consumer report. According to Comcast procedures, a credit report is run when an order is created if the box for "risk management" remains checked during the ordering process. The risk management option is intended to minimize Comcast's risk of not receiving payment for equipment and bills, and to protect the consumer's identity. The ordering system's default setting is for the box to be marked. If a consumer declines, then the box is unchecked and the representative verifies identification and collects a $50 deposit. However, $50.00 does not cover the actual cost of Comcast equipment or the typical monthly service charges. The Plaintiff's bills reflect that his first month's bill was reduced by $50, which meant that Comcast (more accurately, the third party vendor) did not delineate his payment as a deposit.

The Plaintiff learned that Comcast had run his credit when he obtained his credit report from Equifax Credit Report. The Plaintiff canceled his services with Comcast due to its handling of the situation.

## ANALYSIS

The Plaintiff alleges that Comcast violated 15 U.S.C. § 1681b(f) and 1681n when it obtained the Plaintiff's consumer report without a permissible purpose. Section 1681b(f) provides that a person "shall not use or obtain a consumer report for any purpose" except those purposes that are "authorized" under the statute. The authorized, or permissible, purposes for obtaining a report are provided in § 1681b(a), which allows a report to be provided to a person who "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer" or who "otherwise has a legitimate business need for the information ... in connection with a business transaction that is initiated by the consumer." 15 U.S.C. § 1681b(a)(3). A person who "willfully fails to comply" with the requirements of the FCRA when obtaining a consumer report may be civilly liable to the consumer. 15 U.S.C. § 1681n(a) (civil liability for willful noncompliance).

**\*3** A company has a legitimate business need when it assesses a consumer's eligibility for a business service, and to verify the identity of the consumer to prevent identity theft. *See Bickley v. Dish Network, LLC,* 751 F.3d 724, 731 (6th Cir.2014) (finding that service providers "have a legitimate interest in confirming that prospective consumers are who they claim to be and are eligible for services. This prevents the corporation from providing services that might not be reimbursed and protects innocent consumers ... whose identity might otherwise be stolen"). The Plaintiff argues that the parties structured the August 6, 2012, transaction so that no legitimate need arose because Comcast, pursuant to its policy, agreed to accept a $50 deposit in lieu of performing a credit check. The Court finds that, even if Comcast lacked a legitimate business need based on this arrangement and thus violated the FRCA, the Plaintiff has not established that Comcast's violation was willful, a necessary showing to obtaining any recovery under 1681n.

In *Safeco Insurance Co. of America v. Burr,* the Supreme Court analyzed whether the phrase "willfully fails to comply" in section 1681n(a) extends to reckless behavior. 551 U.S. 47, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). The Supreme Court held that liability under section 1681n extends to actions known to violate the FCRA, as well as to actions stemming from a reckless disregard of a statutory duty. *Id.* at 57–58. The Court explained that "[w]hile 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.' " *Id.* at 68 (quoting *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The Court concluded that "a company subject to [the] FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* The Court found that even though one of the two defendants had violated the statute, the violation was not reckless because it was based on a reasonable reading of the FCRA, and because there was no authoritative guidance from either the courts of appeal or the Federal Trade Commission on how the statute should be interpreted. *Id.* at 70.

It is not clear whether Comcast believed consumer permission was statutorily necessary to run a credit check, or was just a normal aspect of its business practice. It is likewise unclear whether Comcast thought that, by

offering the payment of a deposit as an alternative to running a credit check, an otherwise legitimate business need would be dissolved and it would be exposing itself to statutory damages if it then obtained a consumer report. There is certainly no authoritative guidance from the Federal Trade Commission on the impact of the parties' agreement on the legitimate business need. And the only circuit opinion remotely on point is a 1999 decision from the Second Circuit. *See Scott v. Real Estate Fin. Grp.,* 183 F.3d 97 (2d Cir.1999). In *Scott,* the plaintiffs used the services of a real estate broker to find a rental home. According to the plaintiffs, they expressly conditioned their offer to rent a particular home on the homeowner being willing to forego a credit check. The homeowner rejected the condition and insisted on credit checks, and the real estate broker obtained the plaintiffs' consumer reports without their knowledge. The court held that the broker did not have a legitimate business need for the plaintiffs' consumer report under those circumstances. *Id.* at 100 (stating that a fact finder who credited the plaintiffs' testimony "could find that they conditioned their offer to rent on the owner's willingness to forego a credit check" and that the broker "knew that there was no longer a pending transaction" between the homeowners and the plaintiffs "as soon as his clients insisted on the credit report"). The court reasoned that parties who structure negotiations so that an offer to enter a business transaction is made with the express condition that no credit check will be conducted, have expressed interest "too inchoate" to give the other party a legitimate business need in connection with a business transaction. *Id.*

**\*4** In the end, the answers to whether a legitimate business need existed after the Plaintiff expressed his desire to pay a deposit is not relevant because nothing presented at trial demonstrates that the Defendant acted knowingly, intentionally, or recklessly in disregarding the protections of the FCRA. The Plaintiff argues that the evidence shows that Comcast knew, through Kumar, that "it had no reason to pull Mr. Newlin's credit report." (Pl.'s Post–Trial Br. 8.) This argument ignores the evidence pointing to the conclusion that Kumar made an error during the ordering process that negated any such knowledge. According to credible trial testimony, if Kumar had unchecked the default for risk management, Comcast would not have obtained the consumer report. The testimony also revealed that the Plaintiff's $50 credit card payment was applied as a payment instead of being held as a deposit. Once a mistake was made in the ordering process and the risk management box remained checked, Comcast obtained the report, but it did not do so knowing that it was violating the FRCA or the Plaintiff's rights. Perhaps a reasonable person in Kumar's position

would have known that he should uncheck the box, but that goes to negligence, not willfulness. *See, e.g., Redman v. RadioShack Corp.,* 768 F.3d 622, 627 (7th Cir.2014) (comparing the known or obvious risk of failing to delete the expiration date on the consumer's credit-card or debit-card purchase receipt with a negligence standard that would ask whether a reasonable person would have deleted it). By relying on the risk management default setting in its ordering system, Comcast did not take any risks of violating the law that were substantially greater than those that can be associated with ordinary carelessness.

The Court finds that Comcast did not knowingly and intentionally ignore the Plaintiff's desires to avoid a credit check (although it certainly would have appeared that way to the Plaintiff who was not privy to Comcast's internal documentation). Despite having the burden to prove Comcast's violation was willful, the Plaintiff did not attempt to present any evidence that Comcast had a deliberate policy of ignoring consumer requests pertaining to credit reports, or a deliberate practice of ignoring its own policy with respect to the deposits, or that it was aware of problems with its system but took no remedial action. *Cf. Redman,* 768 F.3d at 638 ("The company had

to know that there was a risk of error because the identical risk *had materialized previously.* Knowing the risk and failing to take any precaution against it—though a completely adequate precaution would have cost nothing—were indicative of willful violation.") (emphasis added). The existence of a willfulness requirement in the FRCA statute bars recovery in this case.

## CONCLUSION

For the reasons stated above, the Court finds that the Defendant is entitled to a verdict in its favor.

SO ORDERED.

All Citations

Not Reported in F.Supp.3d, 2015 WL 363426

Footnotes

1      The representative was employed by a third-party vendor that Comcast relies on to process new orders for Comcast services.

2      The fee was a one-time installation fee of $34.99. Kumar also confirmed that the regular monthly charges would be $39.99 plus taxes.

WESTLAW

2012 WL 5373448
Only the Westlaw citation is currently available.
United States District Court, D. Puerto Rico.

Maximiliano PEREZ, Plaintiff,
v.
PORTFOLIO RECOVERY ASSOCIATES, LLC, et al., Defendants.

Civil No. 12–1603 (JAG).
|
Oct. 30, 2012.

Attorneys and Law Firms

Maximiliano Perez, Guaynabo, PR, pro se.

Francisco J. Mercado–Olivero, Colon, Colon & Martinez, San Juan, PR, for Defendant.

**OPINION & ORDER**

JAY A. GARCIA–GREGORY, District Judge.

*1 Pending before the Court is Portfolio Recovery Associates, LLC's ("Defendant") Motion to Dismiss under FED.R.CIV.P. 12(b)(6). (Docket No. 8). For the reasons that follow, the Court GRANTS this motion and dismisses this case with prejudice.

**BACKGROUND**

Plaintiff Maximiliano Perez ("Plaintiff") filed this suit, *pro se,* alleging that Defendant had willfully violated the Fair Credit Reporting Act ("FCRA") in making sixteen unauthorized inquiries into Plaintiff's credit report. (Docket No. 1, ¶ 29). Plaintiff contends that these inquiries harmed his ability to obtain credit and, among other things, resulted in higher insurance premiums.[1] (*See* Docket No. 1, ¶ 33). Defendant does not deny that it made

the inquiries. However, Defendant argues that the FCRA requires Plaintiff to allege that "defendant used or obtained the plaintiff's credit report for an impermissible purpose" and "that the violation was willful or negligent." (Docket No. 8, p. 6; citing 15 U.S.C. § 1681(b)f and *Stonehart v. Rosenthal,* 2001 WL 910771 (S.D.N.Y. Aug. 13, 2001)).[2] Defendant's position is that the complaint does not charge them with either willful or negligent conduct in making those inquiries. Thus, it fails to state a claim and must be dismissed.

**STANDARD OF LAW**

Under Rule 12(b)(6), a defendant may move to dismiss an action for failure to state a claim upon which relief can be granted. To overcome a Rule 12(b)(6) motion, the complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

In *Ocasio–Hernández v. Fortuño Burset,* 640 F.3d 1 (1st Cir.2011), the First Circuit distilled from *Twombly* and *Iqbal* a two-pronged test designed to measure the sufficiency of a complaint. First, the reviewing court must identify and disregard "statements in the complaint that merely offer legal conclusions couched as fact, or threadbare recitals of the elements of a cause of action." *Ocasio–Hernández,* 640 F.3d at 12 (internal punctuation omitted). In this analysis, the remaining non-conclusory factual allegations must be taken as true, even if they are "seemingly incredible," or that "actual proof of those facts is improbable." *Id.* Finally, the court assesses whether the facts taken as a whole "state a plausible, not merely a conceivable, case for relief." *Id.*

**ANALYSIS**

In 1970, Congress enacted the FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 52 (2007). The FCRA aims to ensure "that consumer reporting agencies adopt reasonable procedures for meeting the needs of

commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). The FCRA enforces this goal by imposing civil liability upon a person or entity that willfully or negligently obtains a credit report for a purpose that is not authorized by the statute. 15 U.S.C. §§ 1681b(f), 1681n(a). A plaintiff may recover actual damages for negligent violations, 15 U.S.C. § 1681 o(a)(1), and actual or statutory and punitive damages for willful ones, id. § 1681n(a)(1)-(2); Safeco, 551 U.S. at 53.

*2 Plaintiff contends that on sixteen different occasions, Defendant impermissibly used or obtained Plaintiff's credit report. But the mere fact that Defendant accessed Plaintiff's report without his consent is not sufficient to engage the liability provisions of the FCRA. See 15 U.S.C. § 1681(a); see e.g. Stergiopoulos v. First Midwest Bancorp, Inc., 427 F.3d 1043, 1046 (7th Cir.2005) (observing that § 1681b "does not require that consumers expressly approve each request for a report"). It is the purpose behind the inquiry that is determinative. For example, an entity may procure a person's credit report without permission if it:

> 1. "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer;" Id. at § 1681b(a)(3)(A).

> 2. "intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation;" Id. at § 1681b (a)(3)(A).

> 3. or if it "otherwise has a legitimate business need for the information." Id. at § 1681b(a)(3)(F), such as when a review of a consumer account is necessary "to determine whether the consumer continues to meet the terms of the account." Id. at § 1681b(a)(3)(F)(ii).

To survive Defendant's Motion to Dismiss, the complaint must aver sufficient facts to establish to a plausible degree that Defendant obtained the credit reports for an impermissible purpose, and that their conduct was either willful or negligent. See Footnote 2, supra; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009). The Court finds the complaint fails to meet either requirement.

*Were the inquiries made for a permissible purpose?*
Beyond stating that Defendant made sixteen inquiries into Plaintiff's credit report, the complaint offers no factual basis to infer what purpose—permissible or impermissible—Defendant had in making those inquiries. The complaint starts by stating that Defendant has been "obtaining and furnishing information from the Plaintiff's Transunion consumer credit report with no permissible purpose in violation of the FRCA." (Docket No. 1, ¶ 2). But this is nothing more than a "threadbare recital of the elements of a cause of action," and thus may safely be discarded in this analysis. Ocasio–Hernández, 640 F.3d at 12 (internal punctuation omitted).

The complaint alleges that Plaintiff has no accounts or business with the Defendant "that could grant the Defendant any right to collect, or to have permissible purpose to obtain Plaintiff's consumer report, or make any inquiries ..." (Docket No. 1, ¶ 39). But no part of the FCRA prevents third-parties from searching a person's credit report, even ones with no previous relationship to the person, provided that the inquiry is done for permissible purposes. The fact that Plaintiff had credit problems, as evidenced by the loan rejection letter, (see Footnote 1, supra ), militates against finding that the credit inquiries were unwarranted. See e.g. 15 U.S.C. § 1681b(a)(3)(A) (providing that credit inquiry is permissible for "review or collection of an account of[ ] the consumer"); see generally Huertas v. Galaxy Asset Management, 641 F.3d 28, 34 n. 7 (3rd Cir.2011); see also 15 U.S.C. § 1681b (a)(3)(F)(ii). Thus, this argument is also unavailing.

*3 The complaint also states that the consumer report "places outside the 'permissible purpose' all inquiries" made by Defendant. (Docket No. 1, ¶ 27, copied verbatim ). Plaintiff points to what appears to be a printed page of a section of Plaintiff's website account with Transunion, attached to the complaint as "Evidence A1." (See Docket No. 1–1). That document shows the "account review inquiries" made on Plaintiff's report.[3] These are listed by the company that made the inquiry, and include that company's address and the date on which the requests were made. Some of the inquiries listed include a section titled "Permissible Purpose." For example, the printout shows that two inquiries were made either by Plaintiff or on his behalf. (See e.g. Id. (for "credit monitoring" and due to "consumer request")). Another request was made for the purpose of "collection." (Id.). However, the requests made by Defendants are more numerous than those made by any other entity on the report, and do not have the "permissible purpose" qualifier. Taken in

isolation and in the light most favorable to Plaintiff, this *might* indicate that Defendant did not have a statute-sanctioned purpose in obtaining his credit report. However, it is a stretch (and an implausible one at that) to state that the mere omission of the "permissible purpose" qualifier for Defendant's inquiries *automatically* means that those inquiries were impermissible. *See Heath v. Credit Bureau of Sheridan, Inc.,* 618 F.2d 693, 696 (10th Cir.1980)(noting that "if a credit bureau supplies information on a consumer that bears on personal financial status, but does not know the purpose for which the information is to be used, it may be reasonable to assume the agency expected the information to be used for a proper purpose"). This is so because Transunion bears the same obligation as Defendant, and as any other person intending to inquire upon Plaintiff's credit history, of ensuring that those inquiries are made for permissible purposes.

In any event, *Iqbal* requires that the claims asserted be plausible, not merely possible. *Ashcroft v. Iqbal,* 129 S.Ct. at 1951 (internal punctuation omitted). To nudge a complaint across the line from the possible to the plausible, plaintiffs must do more than deliver "naked assertions devoid of further factual enhancement." *Id.* at 1949 (*citing* Twombly, 550 U.S. at 557); *see also Ocasio–Hernández v. Fortuño Burset,* 640 F.3d at 14–15 (to survive a Rule 12(b)(6) motion to dismiss, plaintiffs must bolster their allegations with "discrete factual events"). Here, while there may be sufficient ground to find that Defendant *possibly* obtained Plaintiff's credit report without any permissible purpose, the complaint—taken as a whole—stops short of showing plausibility. Further, the Court is not required to "conjure up unpled allegations" to support Plaintiff's deficient complaint. *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988).

**\*4** Other courts have faced this type of complaint before, based on similar allegations, and have also found them lacking. *See e.g., Hinton v. Trans Union, LLC,* 654 F.Supp.2d 440 (E.D.Va.2009), *aff'd* 382 Fed. Appx. 256, 2010 WL 2294589 (dismissing FCRA claims that rested on the allegation that the plaintiff never gave his consent to several inquiries in the credit report).

*Were Defendant's actions willful or negligent?*
The complaint fares worse on this prong of the test. To start with, this factor feeds off of the previous one, for the Court cannot find negligence or willfulness where Defendant's conduct was not contrary to the FCRA. But

even assuming *arguendo* that Defendant impermissibly obtained Plaintiff's credit report, the complaint fails to follow through and plausibly plead that Defendant's conduct was either willful or negligent.

At every turn, the complaint claims that Defendant's actions were negligent or willful, but gives no factual basis for these allegations. *(See e.g.,* Docket No. 1, ¶ 29, 30, 35–37, etc.). For instance, the complaint contends Defendant willfully violated the FCRA "by obtaining Plaintiff's consumer report without permissible purpose ..." (Docket No. 1, ¶ 29). But that threadbare statement is not enough. To survive Defendant's motion to dismiss, Plaintiff must aver sufficient facts to plausibly establish that Defendant, either knowingly or with reckless disregard, ignored its obligations under the FCRA. *See Safeco Ins. Co. v. Burr,* 551 U.S. 47, 56–60 (2007)(holding that willfulness as used in § 1681n of the FCRA means knowledge or recklessness). There is no such allegation present in Plaintiff's complaint. Neither is there enough to glean negligence from the pleadings. Simply put, the reasons for which Defendant made the inquiries are unknown and, more importantly, remain unpled.

In *Farkash v. RJM Acquisitions Funding, Inc.,* Slip Copy, 2012 WL 2619710 (S.D.N.Y.2012), the plaintiff alleged he "contacted Defendants to notify them of their violations in an attempt" to amicably settle his dispute. *Id.* at \*2. Like in *Farkash,* the Plaintiff here sent that communication *after* the alleged violations had occurred. (*Cf. Farkash,* 2012 WL 2619710 at 2 *with* Docket No. 1, ¶ 27). Accordingly, Plaintiff cannot claim that his communication put Defendant on notice that their actions were illegal. The opposite seems to be the case, as there appear no inquiries made by Defendant after the date in which Plaintiff allegedly notified Defendant of his impending lawsuit.

### CONCLUSION

For the reasons set forth above, the Court hereby **GRANTS** Defendant's Motion to Dismiss. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

All Citations

Not Reported in F.Supp.2d, 2012 WL 5373448

Footnotes

1    Plaintiff appears to paint these inquiries as the sole reason his loan application was denied. (*See* Docket No. 1, ¶ 32). However, Scotiabank's letter reveals that "excessive inquiries" were but one of four reasons that justified rejecting his application. (*See* Docket No. 1–1). Scotiabank also found Plaintiff's regular and revolving account balances to be "excessive," as well as problems with the length of his credit history. (*Id.*). The Court notes that this attachment forms part of the pleadings and may be considered at the motion to dismiss stage. However, the same is in Spanish and circuit precedent requires it be translated to English. *See Gonzalez–de–Blasini v. Family Dept.,* 377 F.3d 81, 89 (1st Cir.2004) (holding that the "district court should not have considered any documents before it that were in the Spanish language"). **Thus, and in the interest of efficiency, the Court conditions this Opinion and Order on Defendant's submission of a certified translation of the aforementioned exhibit within 30 days of the entry of this Order.** *See* Local Rule 5(g).

2    The Court notes that there is little caselaw in our Circuit dealing with the FCRA, especially regarding the provisions under which Plaintiff brings this case. However, the Court finds that the test outlined by *Stonehart* is consistent with both the statute and other courts which have addressed claims under § 1681(b). *See e.g. Dobson v. Holloway,* 828 F.Supp. 975, 977 (M.D.Ga.1993) ("The fact that a consumer report is furnished for an impermissible purpose ... does not result in automatic liability. Liability is imposed only when the consumer reporting agency either willfully or negligently fails to maintain reasonable procedures to avoid violations of, i.e., § 1681 b."); *see also Phillips v. Grendahl,* 312 F.3d 357, 364 (8th Cir.2002) *abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47 (2007). Accordingly, the Court finds it proper to employ this test here.

3    The Court is not exactly sure what this document represents. For instance, the page explicitly states that the "inquiries are not displayed to anyone but you *and will not affect any creditor's decision or any credit score* ...," (Docket No. 1–1, p. 1) (emphasis added), which belies Plaintiff's contention that his credit eligibility was affected by Defendant's inquiries. This also flies in the face of the statute's definition of what a "consumer report" is. *Cf.* 15 U.S.C. § 1681a(d)(1)(term "consumer report" means any [ ... ] communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness [ ... ] which is used [ ... ] *for the purpose of establishing the consumer's eligibility for credit* ...") (emphasis added). Second, it is not clear whether this page represents all, or only a portion of, the inquiries made on Plaintiff's credit report.